UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **AARON JOHNSON,** | **2:21-CV-12562-TGB-APP** |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **FARMINGTON PUBLIC SCHOOLS, ROBERT HERRERA, and GEORGE HEITSCH,** *in their individual and official capacities***,** | **(ECF NO. 29)** |
| Defendants. | |

Farmington Public Schools has struggled historically to curb incidents of racism and racially disproportionate discipline of its students. Dr. Aaron Johnson, an African American educator employed by the district, advocated for students and staff of color in an effort to change this reality, but he encountered considerable resistance from the community. After resigning from his position as Assistant Superintendent in 2020, he sued Farmington Public Schools and two of its former Superintendents, asserting claims for the violation of his rights under state and federal law.

Defendants have moved for summary judgment on Dr. Johnson's claims. ECF No. 29. The Court held oral argument on this motion on March 4, 2024. Having carefully reviewed the record and considered the

arguments presented in the parties' briefs and at oral argument, the Court will **GRANT** the motion.

## I.    BACKGROUND

Dr. Aaron Johnson is an African American educator who spent approximately thirteen years employed at Farmington Public Schools (FPS), during two separate tours of duty. During his second tenure, he served as Assistant Superintendent, then Associate Superintendent, and finally Assistant Superintendent of Diversity, Equity, and Inclusion (DEI). Dr. George Heitsch was the Superintendent of FPS from 2014-2019, and Dr. Robert Herrera was the Superintendent from 2019-2020.

### A. *Farmington Public Schools*

Farmington Public Schools is comprised of many different schools serving elementary, middle, and high school students. It employs over 1,100 teachers. Herrera Dep., ECF No. 29-6, PageID.613.

FPS's Board of Education sets the policies for the district. Heitsch Dep., ECF No.29-2, PageID.414. The Superintendent sets procedures to implement those policies and is evaluated once a year by the Board. Heitsch Dep., ECF No. 29-2, PageID.414. The Assistant or Associate Superintendent, if there is one, serves as second-in-command to the Superintendent. Heitsch Dep., ECF No. 29-2, PageID.416. Neither the Superintendent nor any of his direct reports have authority to hire and fire employees, but they can make hiring recommendations. Weeks Dep., ECF No. 38-6, PageID.1910.

FPS serves a diverse community. Unfortunately, it struggles with racism, racially disproportionate discipline, and racially disproportionate achievement. It has been cited by the State of Michigan as having disproportionate suspensions of African American students receiving Special Education Services relative to the rest of its population. *See, e.g.*, Oct. 11, 2017 Letter, ECF No. 29-16, PageID.1118. School officials have voiced concerns that some of its assessment tools are racially biased. Heitsch Dep., ECF No. 29-2, PageID.461. And African American students are disproportionately absent from Advanced Placement programs that would place them more favorably to pursue higher education. Weeks Dep., ECF No. 38-6, PageID.1923.

Racial incidents in the community have caused tension and discord. African American principals and administrators report the presence of racial hostility in the school community and say that staff who bring up racial issues risk being seen as troublemakers. Corbitt Dep., ECF No. 38-9, PageID.2054; Alexander Dep., ECF No. 38-7, PageID.1964. Dr. Heitsch characterized the racial atmosphere in the community during his tenure as "fluid;" he recalls "there were moments of an agitated racial climate, and there were moments of everybody working together pretty well." Heitsch Dep., ECF No. 29-2, PageID.452. Dr. Tyrone Weeks, who worked at FPS for several years but is now Superintendent of a different district, remembers that—while he had experienced racism as often being present in many school districts in insidious forms—he was surprised by the

3

amount of openly racially insensitive behavior he experienced at FPS. Weeks Dep., ECF No. 38-6, PageID.1913.

To this end, FPS has promulgated anti-discrimination and anti-harassment policies. Heitsch Dep., ECF No. 29-2, PageID.406. From the record it appears that, under these policies, the district's Title IX office, which was headed by Naomi Khalil for many years, is broadly responsible for investigating reports of any sort of discriminatory conduct by students, while the Human Resources Department handled complaints of discrimination by teachers, administrators, faculty, and staff. Heitsch Dep., ECF No. 29-2, PageID.411. The Title IX office has checklists and guidance for investigating actions by students; a law firm retained by FPS, meanwhile, provides a half-day training to Human Resources personnel about once every two years regarding complaint processing and investigation. Heitsch Dep., ECF No. 29-2, PageID.410-11.

### B. Johnson's First Tenure at FPS: 2005-2012

Johnson first began working for FPS in 2005 as Assistant Principal of Farmington High School. Johnson Dep., ECF No. 29-10, PageID.891. In January 2008, he became Principal of Harrison High School, where he remained until he accepted a position as Director of Secondary Education at Grosse Pointe Schools in 2012. *Id.* at PageID.904, 909, 940.

Before Dr. Johnson left FPS, he was involved in several DEI initiatives, including staff trainings, creating a mentoring program for male African American students, and looking for classroom texts that

4

were better aligned to the cultural experiences of African American students. ECF No. 29-10, PageID.955-56. His resignation letter from the district suggests that he had an overall positive experience:

> Over the past seven years, I have been exposed to development that has helped me to hone my administrative, instructional leadership, and management skills. I have been shown support from all levels of the organization from the Board of Education and the Superintendent to staff members who work directly with students.
>
> I am indebted to Farmington Public Schools for the trust, opportunity for growth, and the investment in my professional career. I look forward to continuing to work with colleagues in the Farmington Public Schools, and with colleagues in other districts in the region and state to improve student learning.

Johnson Letter, ECF No. 29-11, PageID.934.

### C. Return to FPS: 2014-2020

In 2014, Johnson returned to FPS—this time as Assistant Superintendent. Johnson Dep., ECF No. 29-10, PageID.971. Dr. Heitsch, who had just begun his tenure as Superintendent, called Johnson and told him, "I'd like you to come back here." Johnson Dep., ECF No. 29-10, PageID.937. At the point, Johnson was disillusioned with racism in the Grosse Pointe Schools system and ready to leave. Johnson Dep., ECF No. 29-10, PageID.938.

The parties have not submitted Johnson's employment contract for his first year back at FPS, but a salary report reflects that his starting pay was $117,838.56. Salary Report, ECF No. 29-20, PageID.1489. As

part of his onboarding, he was required to certify that he received and was responsible for complying with Board Policies and Procedures. Certification, ECF No. 29-3, PageID.484. These policies included a sexual harassment policy, a notice of nondiscrimination, an anti-harassment policy, a complaint procedure for harassment, and rules of conduct. *Id.* The Board's Notice of Non-Discrimination is reprinted in the Student Code of Conduct and provides that "it is the policy of the Farmington Public Schools that no person shall be discriminated against based on race, color, religion, national origin or ancestry, sexual orientation, gender, age, disability, height, weight, or marital status in any of its programs, services, activities or employment." Student Code of Conduct, ECF No. 29-4, PageID.486.

Johnson's return to the district was greeted with excitement. Smith Dep., ECF No. 38-5, PageID.1878. Gregory Smith, who at the time held a position as the Assistant Principal at Power Middle School but is now FPS's DEI Director, recalls that with Johnson's return and the beginning of Dr. Heitsch's tenure, there was "great momentum and just high spirit relative to the climate of the district." ECF No. 38-5, PageID.1878. Johnson resumed his DEI work almost immediately—continuing his search for culturally appropriate texts, starting conversations about racially biased testing, creating an Anti-Racism Institute, and working with Title IX Director Naomi Khalil to implement more equitable and restorative practices across the district. *See, e.g.*, Johnson Dep., ECF No.

29-10, PageID.957-58; Smith Dep., ECF No. 38-5, PageID.1873. He was also involved in developing a Positive Culture Handbook, geared at replacing old disciplinary practices with more equitable and restorative ones. Heitsch Dep., ECF No. 29-2, PageID.475; Johnson Dep., ECF No. 29-10, PageID.958.

But the scope of Johnson's duties was poorly defined. The position he accepted collapsed roles that had previously been held by three or four people into one. Johnson Dep., ECF No. 29-10, PageID.972; Corbitt Dep., ECF No. 38-9, PageID.2064. A principal recalls that it was Dr. Heitsch who made the decision to consolidate the roles; "[he] was a money man, he was getting our budget right, or whatever." Corbitt Dep., ECF No. 38-9, PageID.2064. Executive Director of Special Education Dr. Jacqueline McDougal recalls that "there were quite a few duties that [Johnson] was responsible for. And there were—so he did have a huge workload, I must say." ECF No. 38-2, PageID.1736.

### D. Heitsch's Tenure

When Dr. Heitsch's tenure began, the district was out of compliance with Michigan's disciplinary standards for Special Education students. Heitsch Dep., ECF No. 29-2, PageID.383. Heitsch began developing plans to address this. *Id.* Dr. McDougal recalls that, to combat disproportionate discipline, the district hired Restorative Practice Facilitators for its middle and high school students. McDougal Dep., ECF No. 38-2, PageID.1741. Over time, this work had the desired effect: the district

7

pulled itself back into compliance with Michigan's standards during the 2016-17 school year. *See* Oct. 11, 2017 Letter, ECF No. 29-14, PageID.1118. Johnson testified that this was partly because of the work he helped support. Johnson Dep., ECF No. 29-10, PageID.1038.

According to Heitsch, he tried to combat racial tensions and incidents by instituting Implicit Bias Training throughout the district and also implementing a program called "Infinity Circle," both of which he personally attended. ECF No. 29-2, PageID.403. He says he envisioned the implicit bias training to become mandatory for every employee, but its implementation was gradual, and he resigned before it was completed. Heitsch Dep., ECF No. 29-2, PageID.405. Khalil and Johnson did most of the heavy lifting on developing the trainings. *See, e.g.,* Alexander Dep., ECF No. 38-7, PageID.1981; Corbitt Dep., ECF No. 38-9, PageID.2066. Khristian Alexander, Johnson's executive assistant for a time, thought the trainings were very well done—but not well received by white staff. Alexander Dep., ECF No. 38-7, PageID.1982.

Dr. Tyrone Weeks recalls that, when he began working at FPS as an Assistant Principal in 2017, he was surprised by the strong program for diversity training:

> I can't speak to what was going on prior to me getting there in 2017, but I know when I got there, I was—to be quite frank, I was actually surprised that the school district was engaging in diversity, equity, inclusion training to the point where there was an institute that was called the Anti-Racist Institute. That was being—that was being led by Dr. Johnson

8

> and a former colleague, Naomi Khalil. I was quite surprised
> that even—certain languages actually even being spoken like
> in public spaces, and that's—to some degree that community
> in Farmington permitted Dr. Johnson to do that kind of work
> at least under Dr. Heitsch.

Weeks Dep., ECF No. 38-6, PageID.1915. Of course, training was not a magic solution; Dr. Weeks says some staff members were visibly uncomfortable with him because of his race, and some refused even to acknowledge him. Weeks Dep., ECF No. 38-6, PageID.1912. According to him, the racial tensions in the district made it difficult to form working relationships but did not preclude him from doing his job. *Id.*

Johnson disputes that Heitsch attended the diversity programming he developed:

> He wouldn't come to, you know, many—like, the Anti-Racism
> Institute, where I needed the superintendent's support to
> show that that was something that he as a white man also
> supported. He wouldn't come to those things.
>
> When I would need resources, instructional resources, for all
> students, but particularly the culturally relevant texts that I
> mentioned earlier, I didn't get that support, so I had to use my
> budget to get those resources for teachers and for students. …
>
> [H]e just didn't oppose it, but he didn't support it, either, to
> the degree that it needed to be supported by the
> superintendent.

ECF No. 29-10, PageID.1071.

1. Discreet Incidents

The record discloses three incidents of racism that occurred during Heitsch's tenure and caused discord between Heitsch and Johnson.

*First*, in 2015, a white student on the baseball team sent a message in a group chat stating, "I will get all of the black girls in school now since I am wearing watermelon boxers." Heitsch Dep., ECF No. 29-2, PageID.391. An African American student then reposted the message in protest. Heitsch Dep., ECF No. 29-2, PageID.392. Heitsch recalls meeting with the African American student and his mom to discuss this incident. Heitsch Dep., ECF No. 29-2, PageID.393. Counsel for Johnson asked Heitsch during his deposition testimony whether the African American student who had exposed the text had later been removed from the basketball team, but Heitsch testified he was unaware of that happening. ECF No. 29-2, PageID.393.

*Second*, in 2016, a teacher pulled an African American student in a sixth-grade special education class at East Middle School out of his chair and forced him to say the Pledge of Allegiance in front of the class. Heitsch Dep., ECF No. 29-2, PageID.394 The day after the incident, a substitute teacher questioned the student about the incident. Heitsch Dep., ECF No. 29-2, PageID.395. While the record does not disclose what kind of questioning the teacher subjected the student to, it must have been inappropriate, because both teachers were disciplined for their conduct: the teacher who pulled the student out of his chair was demoted to a resource room teacher, and the substitute teacher was removed from the building and eventually from the district entirely. Heitsch Dep., ECF No. 29-2, PageID.396-97.

The second incident spurred a protest by African American students, as well as teachers and parents in the district. Heitsch Dep., ECF No. 29-2, PageID.397. Heitsch testified that he wanted to attend the demonstration to address the students and their parents but, though he was "very uncomfortable" not making an appearance, he was asked by African American Board members and legal counsel not to be present. Heitsch Dep., ECF No. 29-2, PageID.397-99.

*Finally*, in 2018, a white Assistant Principal at Harrison High School made a comment that a group of cheerleaders, who were primarily African American girls, looked like "strippers" while performing a dance routine. Heitsch Dep., ECF No. 29-2, PageID.423. The remark led her to be removed from her school building and put on special duty. Heitsch Dep., ECF No. 29-2, PageID.424. The school was slated to close that year, so she was tasked with inventory and other projects related to the closure. Heitsch Dep., ECF No. 29-2, PageID.423. Though she was instructed to stay out of the building during school time, she disobeyed her instructions. Heitsch Dep., ECF No. 29-2, PageID.426. Heitsch spoke to her about her failure to follow instructions but allowed her to continue working until she retired at the end of the year. Heitsch Dep., ECF No. 29-2, PageID.428.

The cheerleader incident spurred district-wide antagonism. Jim Stark, a white board member, expressed disappointment that the cheerleaders themselves were not disciplined, and he wanted to meet

11

with Johnson privately about it. Heitsch Dep., ECF No. 29-2, PageID.440-41; Johnson Dep., ECF No. 29-10, PageID.1066. Johnson says he told Heitsch he was uncomfortable meeting with Stark one-on-one because Stark was a reputed racist, but despite this Heitsch encouraged him to meet with Stark alone. Johnson Dep., ECF No. 29-10, PageID.1066. The record contains few details about what transpired during the meeting. Apparently, however, Stark tried to discourage Johnson from seeking positions outside of the district and encouraged him to remain in his position at FPS. ECF No. 29-10, PageID.1066.

As the cheerleader controversy unfolded, in October 2018, Heitsch's wife—without his knowledge—sent Johnson a message through Twitter that he was not being supportive enough of Heitsch. Heitsch Dep., ECF No. 29-2, PageID.436. The message read: "All I can say right now is how disappointed I am in you. This breaks my heart that you aren't speaking up. He has stood up for you more than you know. He asked not to message you, but I did. Silence is complicity." Heitsch Dep., ECF No. 29-2, PageID.438. Heitsch says that, after he found out about the message, he immediately apologized to Johnson about it. Heitsch Dep., ECF No. 29-2, PageID.440. Johnson denies ever receiving such an apology.

### 2. Conflict with Heitsch

Heitsch and Johnson sparred over Heitsch's handling of these incidents. Heitsch Dep., ECF No. 29-2, PageID.433. Johnson admits that he did not review any reports relating to these incidents but says he

learned of some of them from the news. Johnson Dep., ECF No. 29-10, PageID.1025, 1031. Johnson says he complained to Heitsch several times that the district was racist and not changing but, when he tried to advocate for African American students, Heitsch would dismiss him and often quipped, "Well, maybe I'm just an old racist white guy and that's why I'm not doing anything about it." ECF No. 29-10, PageID.1065. Many African American staff members agreed with Johnson that the incidents were not handled in a manner that brought closure to those affected. Dr. McDougal recalls that students affected were not provided with any counseling, although they probably should have been. McDougal Dep., ECF No. 38-2, PageID.1728-29; Smith Dep., ECF No. 38-5, PageID.1875.

Johnson testified that Heitsch also occasionally made other inappropriate comments. For instance, after Johnson gave a speech at a Black History Month program, Heitsch told him, "You sound like a black nationalist and these PTA moms aren't going to want you as their superintendent." Johnson Dep., ECF No. 29-10, PageID.1065. Further, he says, Heitsch observed at some point after a Board election, "There are four African Americans on this board. This community is not going to like that. We have to do something about that." Johnson Dep., ECF No. 29-10, PageID.1068. And he called Terri Weems, an African American Board member, a "demon." Johnson Dep., ECF No. 29-10, PageID.1069.

According to Johnson, Heitsch appeared to turn against him completely when Johnson pushed back on the district's decision to shut

down Harrison High School. Johnson testified that, after this, Heitsch began acting dismissive around him:

> There are cases where Dr. Heitsch would—when I would bring up—I often brought up issues that were going on in the district with regard to how African-American students were treated, how African-American parents were treated, how African-American staff members were treated, and he took a very apathetic tone at times. He dismissed me at times or wouldn't answer questions.
>
> Sometimes he would sit silently or look to other people for answers that I was asking him questions for. Sometimes when it was—with regard to my work, he would ask other people about my work or ask other people to respond, white members in the cabinet members to respond about work that I was responsible for. Sometimes it would be about [DEI] work. Sometimes it would be about broader instructional topics, but it just depends on what the conversation was about.

ECF No. 29-10, PageID.1080-81. He says that Heitsch also started undermining his authority—for example, he would tell Johnson to complete a task, then later reverse course and tell Johnson to undo his work. According to Johnson, Harrison High School had the largest percentage of students of color in it, ran one of the largest free lunch operations, was in a community that historically faced the largest obstacles in advocating against the shutdown of a school, and was also one of the highest performing of the district's three high schools. Johnson Dep., ECF No. 29-10, PageID.1054.

Johnson complained to Heitsch several times that he was overburdened. He acknowledges that Heitsch promised him help and

support. Johnson Dep., ECF No. 29-10, PageID.1060-61. But, he says, Heitsch never followed through and instead provided more staff and pay raises to departments with white staff. *Id.* Johnson testified that, in combination with Heitsch's remarks, this caused him to start to believe that he was being overburdened work because of his race:

> [H]e believed that I could do it because he felt like I had a certain skill set to do it. But the primary reason why I believed I took on that amount of work was because I was African-American. I saw my white colleagues not having to have that amount of work to do.

Johnson Dep., ECF No. 29-10, PageID.1064.

Johnson also complained to Heitsch that his pay was lower than that of his white colleagues who reported him. Heitsch Dep., ECF No. 29-2, PageID.420. He maintains that Heitsch never did anything to fix this. Heitsch recalls having conversations with Johnson about his pay but does not remember Johnson's complaints about his salary to be tied to race. Believing salaries to be constricted by the Executive Handbook, which sets forth steps and grades for each position, Heitsch offered to promote Johnson to Associate Superintendent as a way to work around the pay disparity. Heitsch Dep., ECF No. 29-2, PageID.420. Johnson accepted the promotion and received several raises, although the change in title appears to have further confused his duties and job description.

Johnson says that his job became so unbearable he began looking for a new one. Heitsch remembers two calls sometime between 2015 and

2016 related to Johnson's applications for Superintendent positions outside the district. Heitsch Dep., ECF No. 29-2, PageID.456-67, 460. Heitsch says that he gave "positive feedback" when he answered those calls, telling recruiters that Johnson was "an exceptional thinker, exceptional writer" with "some strengths way beyond me." Heitsch Dep., ECF No. 29-2, PageID.456-58. Johnson believes, however, that Heitsch was trying to undermine his professional goals and did not want him to become a superintendent. Johnson Dep., ECF No. 29-10, PageID.1065.

Alongside of this, Johnson was working on his dissertation, which he completed in 2016. (A principal recalls that, after he completed his dissertation, "a fire just lit in him, and he was pushing and pushing." Corbitt Dep., ECF No. 38-9, PageID.2063.) After receiving his doctorate, Johnson held a position as a lecturer at Wayne State University from 2016 to 2019—despite FPS policies that prohibited outside work. ECF No. 29-10, PageID.992. His classes started around 5:00 p.m. or 6:00 p.m. ECF No. 29-10, PageID.993. Heitsch and Herrera say that staff complained that Johnson would often close his office half a day early to prepare for classes. Johnson denies this. ECF No. 29-10, PageID.993.

Towards the end of Heitsch's tenure, during a training for administrators which Johnson had organized, an unknown individual AirDropped a picture of a gorilla or an ape. Johnson Dep., ECF No. 29-10, PageID.994-95, 997. From the record it is unclear whether the AirDropped image was received by all attendees or only Johnson.

16

Johnson Dep., ECF No. 29-10, PageID.996. Johnson testified that he told Heitsch about the incident, and Heitsch told him that he wanted to start an investigation. ECF No. 29-10, PageID.998. The record establishes that there was in fact an investigation into the incident but, unfortunately, the perpetrator was never identified. ECF No. 29-10, PageID.998.

Smith remembers that, by this point in his tenure, Johnson was visibly depressed and frustrated by the lack of progress in addressing racial issues in the district. Smith Dep., ECF No. 38-5, PageID.1879. Though he began his work at the district with a "ready to rock" attitude, later on he would sometimes go to Smith's office after meetings with Heitsch and "just cry." *Id.* The stress of his work took a toll on both his health and his family life. *Id.*

### E. Conflict During Herrera's Brief Tenure

Heitsch resigned in 2019, and Herrera took over as Superintendent. Herrera identifies alternatively as white or Latino. ECF No. 29-6, PageID.537. Herrera testified that, during the first few months of his tenure, he attended several Board meetings during which Board members expressed frustration with Johnson for failing to deliver instructional plans that they had requested. Herrera Dep., ECF No. 29-6, PageID.616-17. According to Herrera, two African American Board members—Weems and Terry Johnson—led the questioning and were the most unhappy with Johnson. Herrera Dep., ECF No. 29-6, PageID.617. Johnson disputes that the Board was unhappy with him.

Johnson and Herrera recall that, on Herrera's first day, Johnson began approaching him "regularly" about overwork and lack of clarity in his role and responsibilities. ECF No. 29-10, PageID.1000, 1056, 1059. He also continued his complaints that the district was racist. Johnson Dep., ECF No. 29-10, PageID.1001. According to Johnson:

> On the first day I met him, first fac[e]-to-face, I told him that very thing. I told him that the workload itself was unbearable. I told him the racist practices that were occurring in the district were unbearable. I told him that community members were upset that the previous superintendent and the board of education had not addressed these issues and I was being no support to do these things.

Johnson Dep., ECF No. 29-10, PageID.1056-7. Johnson further told Herrera that he had experienced several discriminatory acts by both Heitsch and the Board, mentioned the AirDrop incident, and said that he was considering pursuing other career opportunities. Johnson Dep., ECF No. 29-10, PageID.1001; Herrera Dep., ECF No. 29-6, PageID.580-81.

Based on their discussions, Herrera reviewed the job description of Associate Superintendent with Johnson. When Johnson expressed disinterest in the broad swath of duties the position entailed, Herrera convinced the Board to create a new position for Johnson, Assistant Superintendent of DEI. Johnson Dep., ECF No. 29-10, PageID.991; Herrera Dep., ECF No. 29-6, PageID.619. Additionally, he created a curricular director position to assist Johnson. Herrera Dep., ECF No. 29-6, PageID.622-23. Herrera also offered to reopen the investigation into

the AirDrop incident, but Johnson told him it was not necessary. ECF No. 29-6, PageID.580.

As discussions unfolded, on November 25, 2019, Herrera sent Johnson a letter memorializing their discussions and discussing his performance. Among other things, this letter provides:

> Since July, we have met on several occasions to discuss the following:
>
> - Lack of clarity on your roles and responsibilities,
> - Priorities areas in teaching and learning (fragmentation to cohesion)
> - Level of implementation for key initiatives (including achievement gap/equity)
> - Prior interactions with the former superintendent and Board of Education,
> - Your desire to pursue other career opportunities
> - Your current mental and physical state
> - And several miscellaneous management and supervisory needs
>   …
>
> During our discussion, I told you that I had once again received feedback from staff stating that you had broken down in front of them, stating your new position was unclear and your workload was overwhelming. Based on this information … I reviewed the job description with you to ensure clarity and requested that you provide me with any specific concerns regarding your roles and responsibilities. Due to the fact that you did not attend the most recent cabinet meeting I also provided you with a copy of your evaluation and requested that you conduct a self-assessment. In order to move forward with finalizing the position and your contract language I will need to you indicate if you would like to continue to serve as the Associate Superintendent or Assistant Superintendent. I am requesting you let me know in writing which position you

would like to move forward with and any concerns regarding roles and responsibilities by December 4, 2019 …

On two occasions you indicated that in prior years you had been racially discriminated against both verbally and in writing. I inquired if you had made a formal complaint. You indicated that you had not. At our most recent meeting you once again indicated that you had been racially discriminated against. I inquired if you believed that I had discriminated against you. You stated "no." I then told you that in the future if you believed I was discriminating against you should inform the BOE Vice President. I added that at the time I was unsure of FPS reporting policy but that was the process other districts had used. I then asked you if you would like a formal investigation conducted. You stated that you would like an investigation conducted. I told you that I would follow up with our legal counsel and get back to you.

ECF No. 29-18.

Johnson says that, by this point, the relationship between him and Herrera had already begun to deteriorate; Herrera had instructed him verbally "to no longer have conversations with any members of the board of education" at some point either before or after sending this letter. Johnson Dep., ECF No. 29-10, PageID.1007. But, he testified, "At this point in time, I believe that the discrimination I experienced from Dr. Herrera had not yet started." ECF No. 29-10, PageID.1006.

Unfortunately, additional racial incidents occurred at FPS after Herrera took over and, as with Heitsch, Johnson sparred with Herrera over the adequacy of the district's response to them.

*First*, in October 2019, an Asian teacher apparently scratched an African American student on the arm. Johnson does not appear to have

known she was a minority teacher.[1] Dr. McDougal explained that the teacher was removed from teaching for a number of weeks during investigation into this incident and received discipline over it. McDougal Dep., ECF No. 38-2, PageID.1738.

*Second*, in November 2019, a teacher called an African American student the n-word.[2] Accounts of the incident vary, and no investigation summary has been made a part of the record. There are some suggestions in the record that the student was involved in an altercation with another African American student, during which the two were fighting each other and calling each other the n-word. Johnson Dep., ECF No. 29-10, PageID.1019; Corbitt Dep., ECF No. 38-9, PageID.2070.

The handling of this second incident in particular marked a turning point in the relationship between Herrera and Johnson. Herrera says that the teacher was tenured, which complicated matters. ECF No. 29-6, PageID.561. Herrera says he had little input once legal counsel became involved because the case went to the tenure commission and, in this case, counsel recommended negotiating a demotion of the teacher to a position where she no longer taught students, followed by resignation at the close of the academic year.

---

[1] This incident was the subject of another case in the Eastern District of Michigan. *See Lambeth-Greer v. Farmington Public Schools*, No. 21-10752, 2023 WL 6932522 (E.D. Mich. Oct. 19, 2023) (Borman, J.).

[2] This incident was also the subject of another case in the Eastern District of Michigan. *See Wells v. Farmington Public Schools*, No. 21-11265, 2022 WL 17361286 (E.D. Mich. Dec. 1, 2022) (Cox, C.J.).

But Johnson was upset that Herrera refused to recommend that the teacher be fired. He testified that their disagreement turned into a yelling match:

> He started yelling at me, started threatening to fire me. He told me that I was using race to divide the community. He started telling me that people were not satisfied with the state of race relations in the district. He blamed all of that on me. He blamed—yeah. He blamed all of the ills of the school district on me at that point in time. …

> At that point in time I was very clear that it was about race. I was very clear that he was talking to me and treating me that way because I was African American. … [H]e kept saying that the work and the advocacy that I was doing around DEI was not needed and I should be engaging in other work. … He at that point in time expressed to me very boldly that he identified as a white man and so that led me to believe that he was using his identity as a white man to discriminate against me as a black or African-American man.

Johnson Dep., ECF No. 29-10, PageID.1086. When Johnson said the district was participating in inequitable practices for students of color, Herrera remarked, "That is true, that it's not fair to anybody." ECF No. 29-10, PageID.1008.

*Finally,* toward the end of the academic year, a tenured African American teacher was terminated because of the way she handled an incident involving a sexual act between two girls in a bathroom. Corbitt Dep., ECF No. 38-9, PageID.2056-57. When the incident came to the teacher's attention, she spoke with the parents and told them, "Don't tell anybody at the district what happened. We can figure this out on our

22

own." Johnson Dep., ECF No. 29-10, PageID.1029. The teacher was a mandatory reporter who was obligated to report the incident to Child Protective Services within 72 hours of its occurrence. Corbitt Dep., ECF No. 38-9, PageID.2068. The manner of her firing was very public—it took place at a Board meeting that was being streamed on YouTube. Corbitt Dep., ECF No. 38-9, PageI.2057. Smith recalled that, when he spoke to African American staff about it afterwards they mentioned that they thought the manner of the firing hearkened back to public slave killings:

> I had—speaking with one teacher as we were kind of watching it play out and it was almost—she referenced it to when slave handlers would outwardly and openly kill a slave in front of others in a sense to, you know, have mind control or to drive down the level of fear in that, and many shared that's what it felt like and it was—they were just shocked.

Smith Dep. ECF No. 38-5, PageID.1885.

According to Johnson, after he tried to advocate on behalf of the African American students and staff involved in these incidents, Herrera started threatening to discipline and fire him. Because of this, Johnson began surreptitiously recording meetings that he had with Herrera. Johnson Dep., ECF No. 29-10, PageID.1027. A letter dated April 2, 2020 from Herrera to Johnson shows that the relationship between them had indeed deteriorated and criticizes Johnson's ability to deal with conflict:

> Based on our conversations, evidence of your work, and/or observable progress towards certain District initiatives, it has become apparent that you have not been effective in your duties. More specifically, I have concerns

regarding your ability to manage or deal with conflict associated with making difficult decisions or addressing difficult situations. This has negatively impacted your effectiveness when implementing change, managing budgets, planning comprehensively (District-wide), and ensuring effective implementation or projects or initiatives. In addition, I believe this has also impacted your ability to willingly address issues until after they become problematic or urgent.

Lastly, I communicated that the Assistant Superintendent role required a commitment to be visible at evening events and involved with community groups/stakeholders. Once again, you admitted to not being involved in the aforementioned even after given a directive.

In summary, the following list reflects the situations that do not reflect the expectations of the role of an Assistant Superintendent:

- Failure to respond to several directives
- Inability to develop reform plans that are comprehensive and systemic
- Lack of public presence at extracurricular events in the community
- Lack of decision making and follow through
- Lack of accountability
- Inability to manage budgets and prioritize resources
- Inability to appropriately supervise personnel

Unfortunately, the concerns I have listed above have negatively impacted your ability to make adequate progress in many of the domains identified in your evaluation. Based on my observations of your progress this year, I must inform you that you will likely receive an *ineffective* rating based on your performance up to this point.

April 2, 2020 Letter, ECF No. 29-24, PageID.1522. Ultimately, however,

it appears Johnson never received a negative performance evaluation.

Herrera testified that, during his brief tenure at FPS, he did not see many successful plans presented by anyone for improving racial tensions. Herrera Dep., ECF No. 29-6, PageID.600. He thought the district was "stuck" in the "creating awareness" phase of addressing racism but never designed or implemented a plan to move forward. ECF No. 29-6, PageID.600. He testified that, because Johnson failed to budget appropriately, the district had to pay back $100,000 in grant money earmarked for marginalized students. Herrera Dep., ECF No. 29-6, PageID.623. Further, Johnson failed to complete onboarding for a Great Lakes Equity program that would have offered technical assistance with the curriculum and social programs. Herrera Dep., ECF No. 29-6, PageID.627. Johnson acknowledges that his duties included some oversight of the budget but denies that FPS needed to return any money to any government program as a result of inaction on his part. Johnson Dep., ECF No. 29-10, PageID.978, 995.

### F. Resignation

Johnson resigned in June 2020. When he did so, he sent a two-page long email to the entire district. Johnson Dep., ECF No. 29-10, PageID.696. The email has not been made part of the record but Johnson recalls that the gist of the message was that "[he] did not close the achievement gap, that [he] was trying to pay back the education debt that was owed to the students, and the education debt means that there are certain things in place in school districts, particularly in Farmington

Public School District, that produced the achievement gap in the first place. What [he] was trying to do rather than fix the symptom was actually to fix the problem itself." Johnson Dep., ECF No. 29-10, PageID.969-70. At the time of his resignation, his annual salary was $150,835.10—the highest of any school official in the district outside of the Superintendent. After he left, his role was divided among three people—two white women, and one African American woman.

Johnson testified that he resigned because of discriminatory acts by Heitsch and Herrera and because his workload was unbearable:

> I left because the job was untenable. It was intolerable. I had faced a number of discriminatory acts by both Dr. George Heitsch and By Dr. Robert Herrera where they both were giving me amounts of work that were undoable for any person …

> I complained over and over to both Dr. Heitsch and Dr. Herrera that the district was racist, that people weren't changing. They both were ultimately responsible for that and did very little action to take—to take action against doing those things. …

> I experienced these things under both Dr. Heitsch and Dr. Herrera for those things and I didn't see them treating my white colleagues the same way. I saw folks—some of my white colleagues get away with not doing work, not being present for after-school or after-work activities which I participated in for the six years that I was there.

> Dr. Heitsch and Dr. Herrera weren't actually interested in the work that I was doing. …

> At one point, as I was trying to do that work, Dr. Heitsch me told me to stop doing the work. He told me to stop going into

> school buildings and talking with teachers and talking with
> parents and talking with administrators.
>
> …
>
> Dr. Herrera on several occasions would say that I wasn't doing
> my job when he never even asked me what I had done
> previously. He never asked me what the context of the district
> before he arrived. He never asked that because he wasn't
> interested in it.

Johnson Dep., ECF No. 29-10, PageID.1051-53. With Herrera, there was

also constant yelling and threats in response to his advocacy for African

American students and staff. ECF No. 29-10, PageID.1051.

There is some dispute over whether Johnson secured a new position

before or after resigning. An employment contract suggests that he had

made the decision to go work for the Equity Collaborative as early as

March of 2020, but Johnson denies that the dates on the document are

accurate. Johnson Dep., ECF No. 29-10, PageID.1022.

### G. This Lawsuit

In October 2021, Johnson brought suit against Farmington Public

Schools, Heitsch, and Herrera. The operative complaint alleges the

following six causes of action:

- Count I: Violation of 42 U.S.C. § 1983 – *Monell* Liability –
  Farmington Public Schools;
- Count II: Violation of 42 U.S.C. § 1985 – Conspiracy Invidious
  Racial Animus;
- Count III: Violation of 42 U.S.C. § 1981 – The Right to Make
  and Enforce Contracts;
- Count IV: Violation of 42 U.S.C. § 1983 Fourteen Amendment
  Equal Protection Clause;

- <u>Count V:</u> Violation of the Elliott-Larsen Civil Rights Act Race Discrimination; and
- <u>Count VI:</u> Violation of the Elliott-Larsen Civil Rights Act Retaliation.

Having completed discovery, Defendants move for summary judgment with respect to all of Johnson's claims. Johnson concedes that Count II, the § 1985 claim, must be dismissed but otherwise opposes summary judgment.

## II.   LEGAL STANDARDS

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute exists if "the record taken as a whole could not lead a rational trier to fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574. 587 (6th Cir. 1986).

At summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inference in his favor. *Id.* The nonmoving party's evidence need not be in an admissible form. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). But he must "show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

## III.   DISCUSSION

### A. *42 U.S.C. § 1983 Equal Protection Claim [Count IV]*

The Court will begin with Dr. Johnson's claim under 42 U.S.C. § 1983. Defendants contend that they are entitled to summary judgment on this claim because Dr. Johnson has presented no evidence that he suffered an adverse employment action. ECF No. 29, PageID.350-55.

To prevail on a § 1983 claim, a plaintiff must show that (1) he was deprived of a right secured by the Constitution or laws of the United States, and (2) that this deprivation was caused by a person acting under color of state law. *Gregory v. Shelby Cty., Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000). The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall … deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, and prohibits public employers, like public schools, from discriminating against employees on the basis of race. *Blick v. Ann Arbor Public School District*, 516 F. Supp. 3d 711, 721 (E.D. Mich. 2021).

In the Sixth Circuit, employment discrimination claims under § 1983 are evaluated using the same standards as Title VII of the Civil Rights Act. *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019). Title VII makes it illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

29

1. <u>Disparate Treatment</u>

A plaintiff may establish a discrimination claim under Title VII through direct evidence or by presenting indirect evidence under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Johnson's brief does not clearly set forth which theory he is pursuing but addresses only the *McDonnell Douglas* burden-shifting framework.

To establish a prima facie case of intentional discrimination, a plaintiff employee generally must provide evidence that (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was otherwise qualified for the position, and (4) he was replaced by someone outside of the protected class or treated differently than a similarly situated, non-protected employee. *Deleon v. Kalamazoo Cty. Road Com'n*, 739 F.3d 914, 918 (6th Cir. 2014). The dispute here centers on the second and fourth elements: whether Johnson has adduced adequate evidence of an adverse employment action, and whether he has evidence that he was treated differently from his white coworkers.

Defendants contend that Johnson lacks evidence of an adverse employment action. An "adverse employment action" is a "materially adverse change in the terms and conditions of employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (quotations omitted). And indeed, the record shows that Johnson was never fired, suspended, or disciplined. During Heitsch's tenure, he was

promoted—from Assistant to Associate Superintendent. Although during Herrera's tenure his title changed back to Assistant Superintendent, Defendants have presented testimony that this title change was processed at his own request to reduce his duties. Johnson has not pointed to any evidence disputing this; most of his testimony corroborates that he was looking for ways to decrease his workload because he felt overburdened. And there is no dispute that despite the change in title there was no reduction in Johnson's pay. *Koscis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) ("[R]eassignments without salary or work hour changes generally do not ordinarily constitute adverse employment decisions in employment discrimination claims.").

Johnson generally "disagrees" that he experienced no adverse employment actions, but his brief makes no effort to identify any discreet action. ECF No. 38, PageID.1708. The Court has scoured the record for evidence of other actions that could be considered adverse within the meaning of a Title VII discrimination claim. In his factual background, Johnson raised a dispute over whether Herrera "gave" Johnson his office or simply "switched" with him. But there is no evidence that the office was materially worse. To the extent Johnson wishes to base his § 1983 claim on actions he says he experienced in retaliation for his advocacy for African American staff and students, the Sixth Circuit has held that § 1983 does not embrace such a theory. *Day v. Wayne Cty. Bd. of Auditors*, 749 F.2d 1199, 1205 (6th Cir. 1984) ("Where an employee establishes

31

employer conduct which violates both Title VII and rights derived from another source—the Constitution or a federal statute—which existed at the time of the enactment of Title VII, the claim based on the other source is independent of the Title VII claim, and the plaintiff may seek the remedies provided by § 1983 in addition to those created by Title VII. Here the district court found that the defendants did not discriminate against the plaintiff. The only wrongful act was their retaliation for the plaintiff's actions, a violation of Title VII. We conclude that Congress did not intend this violation to be the basis of a § 1983 claim.")

Johnson argues that he experienced disparate treatment because less was expected of his white colleagues and they were paid more than he was, even though many of them were his subordinates. ECF No. 38, PageID.1708. But he lacks sufficient evidence that his white colleagues were similarly situated. It is true, as Johnson notes, that the Sixth Circuit has not required "exact correlation" between two employees to establish that they are apt comparators. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Yet here there is evidence that Johnson's position when he returned to the district was newly created—and he has presented no details of how the duties of that position compared to the duties of his subordinates beyond vague testimony that he had more of them. Nor has he offered any evidence, beyond similarly non-specific testimony that they received more support and resources, as to how his colleagues were treated more favorably.

Nonetheless, Johnson maintains that he was paid less than his co-workers despite having more duties. He does not dispute the contents of the salary report Defendants have submitted, which show the following:

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Johnson | $117,838.56 | $129,225.98 | $129, 476.10 | $144,667.87 | $144,667.87 | $150,835.10 |
| Smith | $132,600.00 | $128,963.90 | $128,963.90 | $146,373.56 | $148,788.51 | $150,283.12 |
| Manier | $134,928.04 | $131,227.98 | $131,227.98 | $141,432.54 | $143,970.08 | $138,678.42 |
| Kaminski, Jennifer | $111,100.00 | $107,867.94 | $128,813.88 | $140,464.84 | $144,551.73 | $150,133.10 |
| Stroughter | $127,026.90 | $123,513.94 | $106,798.12 | $110,338.47 | $113,078.14 | $115,965.00 |
| Kaminski, Julie | $131,897.98 | $131,898.08 | $128,385.04 | $128,384.88 | $120,649.10 | $122,899.10 |
| Kauffman | $124,854.94 | $123,361.94 | $125,819.98 | $120,349.08 | $120,349.08 | $122,349.08 |

Generally, plaintiffs seeking to proceed on a disparate-pay theory must provide evidence that the employer "pays different wages to employees … on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Vehar v. Cole Nat'l Grp, Inc.*, 251 F. App'x 993, 998 (6th Cir. 2007). The burden then shifts to the defendant to prove the wage differential is justified based on a seniority system, a measure system, a system which measures earnings by quantity or quality of production, or anything other than a protected characteristic. *Buntin v. Brethitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998).

Viewing the record in the light most favorable to Johnson, the Court questions whether he has adduced enough evidence to meet even the threshold requirement of showing disparate pay. Of course, he was paid considerably less than Manier and Smith during his first year as

superintendent, but from there his pay jumped rapidly and increased steadily—while his colleagues' salaries did not increase as rapidly and were sometimes subject to dramatic reductions. (And as Defendants noted during oral argument, because a § 1983 claim is subject to a three-year limitations period in Michigan, a claim going back to the beginning of his tenure would be time-barred). Even if Johnson has met the threshold showing, he lacks evidence suggesting that Defendants' explanation for any pay disparity is pretextual. As Heitsch explained, "There's an Executive Handbook with salary bands and salary steps, so that as Assistant Superintendent, when you got to the step you made more. I believe both Kathy and Jon were further along their steps than Dr. Johnson at that point." ECF No. 29-2, PageID.420. Johnson lacks evidence creating a dispute over whether this explanation is pretextual.

The Court has also considered whether the fact that Johnson's responsibilities were split among multiple individuals could suggest evidence of disparate treatment based on race. But his job was split among three individuals, one of whom was African American, so there is no such argument. The Court declines to sit as a super personnel department second-guessing the district's decisions over which positions it could budget for during any particular school year.

2. <u>Constructive Discharge</u>

Johnson next attempts to proceed on a theory that he was constructively discharged from his job. Constructive discharge would

satisfy the "adverse employment action" of his discrimination claim. *Gosbin v. Jefferson Cty. Comm'rs*, 725 F. App'x 377, 388 (6th Cir. 2018).

A constructive discharge claim has two basic components: 1) discrimination by an employer so severe that a reasonable person would have been compelled to resign; 2) actual resignation. *Green v. Brennan*, 136 S. Ct. 1769, 1776-77 (2016). To establish constructive discharge, the employee must prove both that: "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001) (internal quotations and alterations omitted). Courts look at all the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003) (quotations omitted).

Johnson's briefs do not distinguish between the evidence of Heitsch's and Herrera's actions with regard to this is claim. This is problematic, as persons sued under § 1983 can be held liable only based on their own unconstitutional behavior. *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012).

As to Heitsch, Johnson claims that he made insensitive remarks when Johnson complained that the district was racist. But the examples

he provides are scattered and few in number ("Well, maybe I'm just an old racist white guy" and "you sound like a black nationalist and these PTA moms aren't going to want you as their superintendent"). Beyond these remarks, Johnson points out that Heitsch was dismissive and undermined him at meetings by "sit[ting] silently or look[ing] to other people for answers" when Johnson asked questions. Johnson Dep., ECF No. 29-10, PageID.1081. He also says his workload was "unlawfully, inappropriately and unnecessarily increased" during this period—though he provides few details. ECF No. 38-11, PageID.2081. But of course, Johnson did not resign during Heitsch's tenure, so this theory is unsustainable against Heitsch.

Regarding Herrera, Johnson testified that Herrera increased his workload, refused to provide him with necessary support, and began yelling at him during cabinet meetings and having heated closed-door meetings with him after he advocated in November 2019 for the termination of the teacher who called her student the n-word. McDougal Dep., ECF No. 38-2, PageID.1748; Smith Dep., ECF No. 38-5, PageID.1880. There is evidence in the record that Johnson was so distraught after these yelling matches that he would go to his colleague Smith's office to cry. But his testimony that Herrera increased his workload is indistinguishable from his testimony that Heitsch did the same. *See, e.g.*, Johnson Aff., ECF No. 38-11, PageID.2081 ("Herrera and Heitsch…unlawfully, inappropriately, and unnecessarily increase[ed]

36

my workload.") And even accepting as true Johnson's descriptions of Herrera as yelling, Johnson does not connect this behavior to any racial animus against him, or to any adverse action affecting the terms of his employment.  Something more than experiencing a yelling boss, too high a workload, or unclear duties is needed in order to make out a claim of employment discrimination based on race.

Details are lacking; a plaintiff opposing summary judgment must present more than a "mere scintilla" of evidence to create a genuine issue of material fact. *Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017). Summary judgment is the so-called "put up or shut up" moment on critical issues in a case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). Johnson has provided no details as to *how* or *when* Herrera increased his workload or changed his duties; Herrera, meanwhile, testified that he convinced the Board to create a new position to reduce Johnson's workload while keeping him at the same level of pay, hired a curricular director to assist Johnson, and also personally began shouldering some of Johnson's duties. As to Johnson's assertions about Herrera's temper, what is lacking is evidence that Herrera's behavior was "calculated to encourage" a resignation. *See Logan*, 259 F.3d at 571. Viewed in the light most favorable to Johnson, the record suggests at best professional disagreement coupled with an obstinate and irascible temperament—not a calculated effort to goad Johnson into resigning.

37

3.  Hostile Work Environment

The Sixth Circuit has previously permitted § 1983 claims for hostile work environments. *See Boxill*, 935 F.3d at 520. To prevail on such a claim under Title VII, a plaintiff generally must provide evidence that: 1) he belonged to a protected class; 2) he was subject to harassment; 3) that harassment was based on his membership in the protected class; 4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and 5) defendant knew or should have known about the harassment and failed to act. *Johnson v. Motor Co.*, 13 F.4th 493, 503 (6th Cir. 2021).

To support this claim, Johnson says that he was overburdened with work. Missing, however, is a link between his workload and his membership in a protected class. True, Johnson testified that he *believed* he was being saddled with an excessive workload because of his race:

> Q: And what was the motive, if any, that you shared with George Heitsch that made you believe that now you're being overburdened with this work?
>
> A: That I was African-American, that—he believed that I could do it because he felt like I had a certain skill set to do it. But the primary reason why I believed I took on that amount work was because I was African-American. I saw my white colleagues not having to have that amount of work to do.

Johnson Dep., ECF No. 29-10, PageID.1064. But mere belief is not enough to support a claim at the summary-judgment stage.

Johnson additionally argues that "[t]here were cabinet meetings in which Heitsch would be so rude to Plaintiff, that it would make other African Americans present in the meetings uncomfortable. This included Heitsch having an apathetic tone, when Plaintiff brought up issues of discriminatory conduct in the district, Heitsch would ignore and dismiss Plaintiff's questions in the presence of the cabinet." ECF No. 38, PageID.1712. While rude, conduct such as "having an apathetic tone" and being "dismissive" is not the type of egregious behavior that the Sixth Circuit has normally found necessary in order to deemed "severe" or "pervasive" within the meaning of a hostile work environment claim. *See, e.g.*, *Bruce v. Meharry Med. College*, 692 F. App'x 275, 279 (6th Cir. 2017) (holding that, in the context of a sex-discrimination claim, "comments and expressions of exasperation" occurring at committee meetings were insufficient to establish hostile work environment).

Beyond this, Johnson offers a handful of offensive comments from Heitsch—"Well, maybe I'm just an old racist white guy;" "you sound like a black nationalist and these PTA moms aren't going to want you as their superintendent;" Weems was a "demon;" and a remark that the community might not be happy that the composition of the Board was majority African American. Johnson also points to evidence that Heitsch's wife sent him a Twitter message accusing him of being unsupportive when Heitsch faced community backlash over the principal's remark that the cheerleaders' dance routine made the

students looked like "strippers," and to the incident of an unknown staff member AirDropping a photo of an ape during a technology training. While these alleged remarks by Heitsch are racially charged and unquestionably inappropriate, and the AirDrop incident is outright reprehensible, they are isolated incidents that occurred over a nearly five-year period. *See Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 513 (6th Cir. 2011) ("The statements were isolated, not pervasive: all but two occurred over a two-day period. … Th[e] statements—for example, calling Jesse Jackson and Al Sharpton 'monkeys' and saying that black people 'should go back where [they] came from' are certainly insensitive, ignorant, and bigoted. But they more closely resemble a 'mere offensive utterance' than conduct that is 'physically threatening or humiliating.'").

Johnson additionally points to testimony that Herrera yelled at him and turned red in the face and hands when he brought up racial issues. But again, what is lacking is evidence showing that this sort of rude conduct was based on Johnson's race and not the result of a difficult temperament and a professional disagreement over how best to handle tensions arising in the schools after racial incidents. "Personal conflict does not equate with discriminatory animus." *Morris v. Oldhan Cty. Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000) (quotations omitted). And viewed in the light most favorable to Johnson, the record establishes at best that he had a highly contentious relationship with Herrera and that the two disagreed heatedly over how the district should be run.

The Court is mindful that, in reviewing hostile work environment claims, the work environment must be considered as a whole:

> The severe and pervasive analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of individual episodes.

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) (quotations and alterations omitted). The record contains considerable evidence demonstrating a backdrop of racial hostility generally present in the FPS community. But it lacks evidence that Defendants were indifferent to it or failed to act; instead it contains evidence of heated disagreements between Johnson and Defendants over *how* to act.

In sum, Johnson has insufficient evidence of Defendant's indifference to severe and pervasive harassment altering the terms of his work. Accordingly, FPS's motion is **GRANTED** on this claim.

### B. Monell *Claim [Count I]*

Defendants next contend they are entitled to dismissal of the *Monell* claim because Johnson lacks evidence of an unconstitutional policy, ratification of unconstitutional conduct, and a failure to train. ECF No. 29, PageID.362-65.

A municipal entity, like Farmington Public Schools, cannot be held liable under § 1983 for an injury inflicted solely by its employees. *Thomas*

*v. Chatanooga*, 398 F.3d 426, 429 (6th Cir. 2009). But it may be sued when its official "policy or custom" triggers a violation of a plaintiff's constitutional rights. *Monell v. Dep't Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978). A plaintiff can establish such an unconstitutional custom or policy by producing evidence that shows: (1) the existence of an illegal official policy; (2) that an official with final decision-making authority ratified illegal actions; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Thomas*, 398 F.3d at 426.

Johnson's brief, which discusses only the concept of notice and inaction, makes scant effort to address clearly which theory he is pursuing under his *Monell* claim. ECF No. 38, PageID.1715-16. More fatally, it focus chiefly on the rights of the "students, staff and parents in the district" rather than on the rights of Johnson himself.

FPS has presented evidence, in the form of a document signed by Johnson, showing that it had written policies, including a sexual harassment policy, a notice of nondiscrimination, an anti-harassment policy, and a complaint procedure for harassment. Certification, ECF No. 29-3, PageID.484. Johnson attempts to create a fact question over the existence of these policies by pointing to a declaration by Khalil that she was "not aware of any written policy or customary and/or explicit procedures for investigating and/or disciplining FPS staff, teachers, or administrators who had engaged in racially discriminatory conduct" and

42

"was not aware of any FPS policy in place to address racially discriminatory conduct engaged by its teachers, staff, or administrators." But statements by a particular administrator that she "lacked awareness" are not the same as saying FPS did not have a policy at all. ECF No. 38, PageID.1715

To the extent Johnson attempts to proceed on a failure-to-train theory, he needs evidence that: "(1) the training of supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Showing deliberate indifference in this context requires evidence that a municipality "completely disregarded" its duty to train. *Harris v. City of Saginaw*, 62 F.4th 1028, 1038 (6th Cir. 2023). By his own admissions, Johnson cannot show such a disregard: he testified extensively that he was *personally involved* in conducting these kinds of trainings. There is evidence that these trainings were not well received by white staff. But where relevant training is given, showing that "additional training would have been helpful" does not establish municipal liability. *Mosier v. Evans*, 90 F.4th 541, 550 (6th Cir. 2024).

As to a theory of inaction more generally, Johnson must present evidence that the need to act to prevent violations of constitutional rights is "so obvious" that the municipality's decision not to act can be said to

43

amount to a "policy" of deliberate indifference. *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996). "Deliberate indifference" in this context means more than a collection of "sloppy, or even reckless," oversights. *Id.*

Even when viewed in the light most favorable to Johnson, Johnson has failed to present more than this. To be sure, the record contains extensive evidence that FPS and its Board were aware of racism in the district—as evidenced by their need to respond to at least five discreet episodes involving students during Johnson's tenure. The record further shows that Johnson had specific ideas on how to best respond to these incidents in a manner that would bring closure to the community, and that FPS often rejected his suggestions. As Smith testified:

> [Johnson] really had an expectation that the board of education would see the impact of his role and come alongside him, more specifically, all members, but especially the African American members would be able to see the need, and still he felt as if there was a lot of politicking, a lot of political savviness that was getting in the way, and so it just added to the weight that he was carrying around.

Smith Dep., ECF No. 38-5, PageID.1875.

But the record fails to establish indifference and inaction. Setting aside the issue of identifying whose rights (his or his former students?) he is trying to litigate, at best the record shows that more could have been done to remedy the historically engrained racial hostilities of the district. Johnson's disagreements with Heitsch, Herrera, and the Board over how

44

quickly practices needed to be changed fail to establish inaction. As Dr.

Weeks testified:

> So what I can say as a school superintendent is that there are
> a lot of things you deal with as it pertains to the culture of a
> community. It takes a long time to make shifts in climate.

Weeks, ECF No. 38-6, PageID.1914.

Accordingly, FPS's motion must be **GRANTED** as to this claim.

### C. 42 U.S.C. § 1981 Claim [Count III]

Section 1981 of Title 42 provides employees with a "cause of action

for racial harassment in the work place." *Johnson v. Ford Motor Co.*, 13

F.4th 493, 503 (6th Cir. 2021) (quotations omitted).

Johnson's brief makes little effort to address the complexities of §

1981 claims. It says only that his § 1981 claim is based on the same

theories as his § 1983 claims. ECF No. 38, PageID.1717. Because he has

failed to set forth sufficient evidence creating a genuine fact dispute as to

those claims, he cannot maintain his § 1981 claim.

Accordingly, Defendants' motion is **GRANTED** on this claim.

### D. Discrimination Claim under the ELCRA [Count V]

The elements of Johnson's claim of discrimination under the

ELCRA mirror the elements of his claim for the violation of his Equal

Protection rights. *See Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000).

As Johnson lacks factual evidence creating a material fact question

on his § 1983 claim, Defendants are also entitled to summary judgment

on his claim of discrimination under ELCRA.

### E. Retaliation Claim under ELRA [Count VI]

The Court's conclusions regarding Johnson's § 1983 claims are not dispositive of Johnson's retaliation claim under the Elliot-Larsen Civil Rights Act (ELCRA). The ELCRA was enacted to protect the rights of Michigan citizens to "obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin" and many other protected characteristics. MCL § 37.2102.

Beyond protecting the right of citizens to equal employment opportunities and to be free from discrimination in accessing public services and educational facilities, the ELCRA also protects those who oppose unlawful discrimination. It creates a cause of action against persons who retaliate against those who oppose discriminatory practices, providing that:

> Two or more persons shall not conspire to, or a person shall not … [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

MCL § 37.2701.

Claims of retaliation under the ELCRA are analyzed in the same manner as claims for retaliation under Title VII. The plaintiff has the initial burden of establishing that: "(1) he engaged in a protected activity,

(2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 488 (6th Cir. 2020) (quotations and alterations).

If the plaintiff can make these showings, the burden shifts to the defendant to offer a "legitimate, nondiscriminatory reason" for the adverse employment action. *Jackson v. Genesee Cty. Road Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 441 U.S. 792, 802 (1972)). If the defendant offers such a reason, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* The ultimate burden remains with the plaintiff to convince the factfinder that the defendant retaliated against him for his protected activity. *Id.*

## 1. Protected Activity

From the briefs and the parties' presentations at oral argument, it is unclear whether Defendants challenge Johnson's evidence of protected activity. It is also unclear precisely what protected activity or activities Johnson himself believes forms the basis of this claim.

For a plaintiff to establish that he engaged in a protected activity, he must show that he took an "overt stand against suspected illegal discriminatory action." *Khalaf*, 973 F.3d at 489 (quotations omitted). "[V]ague charges of discrimination" are insufficient. *Id.* (quotations

omitted). Additionally, a plaintiff must have a good faith belief that the apparently discriminatory practice he is opposing is made unlawful by the ELCRA; the Act "does not protected all 'opposition' activity." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (quotations omitted). A plaintiff must also show that the manner of his opposition was reasonable. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008).

Johnson's brief suggests that the focus of this claim is Herrera's threat to fire him after he advocated for the termination of a white teacher who called an African American student the n-word. ECF No. 38, PageID.1719. It is not immediately apparent that advocating that a teacher be terminated could be deemed protected activity. To the extent Defendants suggest protected activity must occur in the form of a written complaint, this is incorrect: opposition to unlawful discrimination need not "be lodged with absolute formality, clarity, or precision." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (quotations omitted). The ELCRA's opposition clause covers a broad swath of conduct, including "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII [or the ELCRA]; and opposing unlawful acts by persons other than the employer—e.g., former employers, union, and co-workers." *Niswander*, 529 F.3d at 721. Nonetheless, plaintiffs proceeding

exclusively under the ELCRA's opposition clause have less protection than those who participate in formal enforcement proceedings. *Id.* at 731

The decision whether to terminate a faculty member for using a racial epithet is a matter of professional discipline for misconduct within the school administrative setting. It is arguable whether an administrator's criticism a superintendent's decision not to recommend the removal of a teacher would amount to opposing of an unlawful practice. Refusing to fire a teacher is not "unlawful" within the meaning of the ELCRA and Title VII. In light of uncontradicted record evidence that Herrera lacked the unilateral power to fire the teacher (as opposed to simply recommending her removal), the Court questions whether there is sufficient evidence for a reasonable juror to conclude that persisting in demanding a superintendent to take an action he has no power to take would be protected activity under ELCRA. At best, it appears to establish a professional disagreement over the appropriate course of teacher discipline.

Though Johnson's briefing narrows the alleged protected activity to his demands that the teacher who used the n-word be fired, the record contains other instances where Johnson spoke out, so the Court has scoured the record for evidence of other protected activity. The record contains testimony that Johnson complained to both Heitsch and Herrera several times that "the district was racist, that people weren't changing." It's not immediately apparent that these complaints are specific enough

to come within the scope of the ELCRA's protections. *See Booker*, 879 F.2d at 1313 (vague complaints about "ethnocism" by employee in internal letter was insufficient to constitute opposition to an unlawful employment practice). Johnson also testified that he complained to African American Board members—including Angie Smith, Terri Weems, and Terry Johnson—that he was a victim of discrimination. ECF No. 29-10, PageID.947. But he has failed to provide any details about when these conversations happened or what was said.

Johnson is on firmer footing with his testimony that tried to advocate for the rights of African American students who were disciplined following racial incidents—for instance, the student who publicized the "watermelon boxers" text message, the student who was forced to say the Pledge of Allegiance in front of the class, and the cheerleaders who were called "strippers." ECF No. 38-11, PageID.2083. But again, detail is lacking. Though the record in this case exceeds well over 2,000 pages at this point, Johnson has failed to explain or provide evidence of *how* and in what manner he opposed the practices he perceived were unlawful. The Court has carefully reviewed his deposition testimony and his later arriving affidavit. But he has provided few (and in some instances no) details about his actions after these reprehensible incidents. And at summary judgment he must offer evidence of what the protected activity was that he took in order to create an issue of fact. These details are critical, but lacking.

2. <u>Knowledge</u>

If a plaintiff succeeds in establishing that he engaged in protected activity, he must next establish that the employer knew about it. Retaliation claims require proof that the individuals charged with taking the adverse employment action knew of the plaintiff's protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 551-52 (6th Cir. 2002).

Johnson's testimony establishes that he repeatedly complained to Herrera, Heitsch, and the Board about racist practices in the District. Those are the individuals and entities he charges with taking adverse actions against him. If his complaints meet the criteria for protected activity, then he has sufficient evidence to establish knowledge. Of course, Board members dispute that they received any complaints from him—verbal, written, or otherwise—that he believed he was the victim of discrimination. But such a dispute would be a matter for a jury.

3. <u>Adverse Action</u>

The parties' main dispute centers on whether Johnson has evidence of an adverse employment action. Defendants maintain Johnson has no evidence of an adverse action. Johnson's briefing focus on Herrera's threat of discipline and termination after he advocated for the termination of the teacher who called her student the n-word.

As Johnson notes, what constitutes an "adverse action" in the context of a *retaliation* claim is broader than in the context of a discrimination claim and includes anything that "well might have

51

dissuaded a reasonable employee from making or supporting a charge of discrimination." *Redlin v. Grosse Pointe Public School Sys.*, 921 F.3d 599, 614 (6th Cir. 2019) (quotations omitted). But context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quotations and alterations omitted).

Under this framework, the threat of discipline and termination Johnson asserts he experienced from Herrera toes the line of what sort of conduct could be considered "adverse" within the meaning of the ELCRA. The Court has no trouble concluding that a threat of termination—especially when it is yelled, as Johnson says it was—would likely dissuade a reasonable employee from opposing a discriminatory practice or making or supporting a charge of discrimination. But even keeping in mind that what is necessary to prove an adverse action within the context of a retaliation claim is substantially lower than what is required to prove an adverse action in the context of retaliation claim, a showing of *some* change in employment circumstances is necessary. And it is unclear that anything *happened* to Johnson as a result of this threat. *See, e.g.*, *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (identifying as a potentially materially adverse action "excluding

an employee from a weekly lunch training that contributes significantly to the employee's professional advancement").

As additional evidence of adverse employment actions, Johnson asserts that "other witnesses testified that Heitsch and Herrera retaliated against Plaintiff for advocating for African Americans in the district and standing up against the racially discriminatory practices" in the district. ECF No. 38, PageID.1719. This misses the mark. Were this case to go to a jury, the ultimate question of whether Johnson experienced retaliation would be a matter of the jury. Johnson's burden at this stage was to provide sufficient evidence of adverse employment actions he experienced as a result of reporting discrimination against himself or as a result of opposing discriminatory acts against students and staff he reasonably believed were unlawful—so that a *jury* could decide if he had succeeded in proving a claim for retaliation. Most of what he has presented is that, when he complained about racism in the district, Heitsch would sigh, Herrera would turn red in the face and hands and yell, and the Board generally did not support his recommendations.

Beyond this, as evidence of additional adverse actions and retaliation he experienced, Johnson points to his testimony that he was required to take on duties that had previously been shouldered by three or four individuals, "setting him up for failure." But this was a fact of his employment well before he engaged in any protected activity. He says that, when he complained to Heitsch that he was being overworked,

Heitsch promised him help but never gave it—and that Heitsch did not support his initiatives to the level a superintendent should have. This falls short of establishing the kind of action that would dissuade a reasonable employee from making or supporting a charge of discrimination. Johnson additionally says he complained to Herrera about the overwork and discrimination that he was facing when Herrera tried to give him additional duties but he remained overburdened. Here, the lack of detail dooms his overwork claim: the record shows that Herrera created a new position for him to reduce his responsibilities while keeping him at the same rate of pay and offered to re-open the district's failed investigation into the AirDrop incident. To the extent Johnson attempts to dispute Defendants' evidence on these points, he has not presented any admissible evidence to do so.

4. <u>Causation</u>

Finally, Johnson must demonstrate causation between any materially adverse employment actions and his protected activity. The ELCRA applies a "but-for" standard of causation. *Khalaf*, 973 F.3d at 489. A plaintiff must show "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013) (quotations omitted). At the prima facie stage the burden on a plaintiff "is not onerous;" it can be met through evidence that the "adverse action was taken shortly after

the plaintiff's exercise of protected rights." *Jackson*, 999 F.3d at 349 (quotations omitted). But it is not nonexistent.

The difficulties identified above concerning what protected activities Johnson may have engaged in and what adverse actions he suffered makes it impossible to embark on any coherent analysis of causation. To the extent Johnson means to assert that he was constructively discharged by being overworked, his evidentiary presentation lacks details of *when* and *how* his duties increased—*i.e.*, after he reasonably opposed what he believed was unlawfully discriminatory conduct, or in another context. He has presented scant evidence that would enable a jury to conclude that Heitsch took an adverse employment action against him, let alone that the action was related to a protected activity. The same is true with respect to Herrera.

Even viewed in the light most favorable to Johnson, the record fails to establish more than irreparable personal conflicts and professional disagreements. It falls far short of creating a fact question requiring submission of the retaliation claim to the jury. Accordingly, Defendants' motion for summary judgment is **GRANTED** on this claim.

## IV. CONCLUSION

Dr. Johnson was hired by the Farmington Public Schools to help the community address a history of racism and inequity in the district. Unfortunately, though Johnson undertook to confront these issues with energy and commitment, racial incidents continued to occur during his

tenure.  Cultivating and nurturing understanding and empathy in the place of division and distrust is a remarkably difficult task.  Dr. Johnson's work in developing equitable practices, increasing sensitivity to racism, and raising awareness to racial bias, whether implicit or express, was clearly needed in the Farmington Public School system. Unfortunately, the record in this case shows that interpersonal conflicts and disagreements between Dr. Johnson and his supervisors over how to address some of the racial incidents that occurred during his tenure led him to resign.  In light of the recurring problems the district experienced, it is to be hoped that Johnson's efforts may leave a lasting and positive legacy leading to greater diversity, equity, and inclusion in the district.

But the question presented by Defendants' summary-judgment motion is: Are there are material fact disputes concerning whether the actions of Johnson's supervisors amounted to intentional discrimination and retaliation against Johnson? Having carefully reviewed all the evidence, the Court concludes, for the reasons explained above, that there are no such issues of fact requiring the submission of this case to a jury. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED**, and judgment will enter in their favor.

It pains the Court to mention one last issue pertaining to the conduct of counsel during the questioning of witnesses at their depositions. A case involving incidents of racism raises topics that are difficult, upsetting, and charged with emotion. This creates a heightened

duty on behalf of counsel to abide by the commitment to professional civility that this Court requires of its officers. In reviewing the depositions in this case, the Court observed conduct by counsel for both sides that was patently rude, uncivil, and insulting. The volume and extent of this conduct was not only disheartening, but it reached such a level that it hampered the Court's ability to review the relevant facts of this case because the bulk of the evidence was comprised of deposition testimony riven with attorney interruptions, squabbles, and distractions.

The Court is constrained to remind counsel that an attorney's conduct should be characterized at all times by professionalism and civility toward opposing counsel, as well as courtesy to the parties, witnesses, and court reporters. An attorney's most valuable attribute is his or her reputation for integrity. Particularly when tensions run high, the role of counsel is to ensure that reason, not rage, is the governing principle of interactions between the parties. Our system of justice depends on lawyers remaining faithful to this professional creed. When they fail to do so they place that system in jeopardy.

**SO ORDERED**, this 31st day of March, 2024.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge